Good morning. May it please the Court. Jeffrey Dickerson appearing on behalf of Appellant Mark Perkins, who was a distribution clerk in Lake Tahoe at the post office in Incline Village. His employment was terminated based upon threats that he had allegedly made to co-workers in recent time to the termination itself. As a result of the investigation of these alleged threats, which he denies he made, he was referred to Dr. Armitage for an evaluation. Dr. Armitage referred it back, indicating that he had narcissistic personality disorder or trait, that he could not confirm bipolar disorder, but we have evidence in the record that he, from the declaration of the plaintiff, that he does have and has been diagnosed with bipolar disorder. And in fact, Judge Reed found that there was sufficient evidence of an actual disability there. I'd like to focus, if we could, on what Judge Reed found. What was the basis for his order granting defendants summary judgment? Judge Reed analyzed the three different claims in this case. There's a discrimination claim based upon disability, there's a handicap. There's a retaliation claim based upon his seeking a reasonable accommodation, and there's a Privacy Act claim. With respect to the discrimination claim, Judge Reed found that the prima facie element of actual disability had been met and, therefore, did not have to go to whether there was a record of disability or regarded as theory that could apply. He found that the bipolar disorder, there was sufficient evidence that that substantially limited his daily life activity of interacting with others. And then he went on to the question of whether or not he was a qualified individual with a disability who could perform the essential functions of his position with or without reasonable accommodation. And on this score, he got hung up with respect to the accommodation issue and found that the, it would be a substantial and undue burden administratively on the employer to have to do what the proposed accommodation was, which was, let me know if I'm going over the edge in terms of my hostility towards others. And now that I'm aware of that, now that I'm treating, and now that I'm medicating, I have the tools to pull back. Once I recognize that I have, that in this particular situation I'm doing that, I have the power now to control that. Under that theory, you would need someone next to him at all times during work hours. There's no evidence that that would be necessary. And the employer has not shown that there's an unreasonable or undue burden in this case. No, I'm based upon your argument. Someone has to be there to be with him because he's now controlled, but he has to be reminded. I don't know how you do that unless you had someone with him all the time. Well, his interaction with Joyce Persick, who was the nurse that he was talking to about this I want to keep my job, the food for thought email that we have at ER 59 in the record, Your Honor, this is the evidence of him seeking a reasonable accommodation. And how that would actually play out is difficult to actually put your finger on. You know, the going through the fingers analysis analogy you did before. But here's what we do know. We know that he had represented that he had sought help and was now able to take things into his own hands if it was pointed out to him. Your question is, does he have to have an angel standing over him the entire time? Answer? No. If people in the workplace are made aware of this, and there's evidence in the record that this was already out that he had bipolar, one of the complaining witnesses knew he had bipolar because she mentioned it in her statement. Silverberg unquestionably knew that he had bipolar disorder. What that was, he wasn't clear on. So if the supervisor calls the employees together and says, Mark's got an anger management problem or a hostility problem, he wants to work on it. If you think that he's going overboard and becoming too hostile in your presence, you need to come to me or tell him there's evidence in the record that he was a prince for six months at a time. And then he would go into this lapse where he would become hostile and depressed and angry. And then he was hard to work with. Hard to work with. And also he had difficulty with the clients. Customers. So someone would have to be close by him at all times to say you need to simmer down. Well, we never got there. Well, I'm I'm just taking it from what you say the problem is and what is necessary for accommodation. I don't see how the accommodation can't be made without people being present. He does. You never know when this is going to happen. Well, it's the purpose of the ADA or the Rehab Act is to take people with disabilities and see if we can keep them in the workplace. And the interactive process involves experimentation. We're talking about, particularly in this case, something that's uniquely human in its origins. It's a human behavioral trait. However, you want to look at it, bipolar, narcissistic trait, whatever. But he he was working it through with medical trained medical help, with physicians and with counselors and with psychologists. He had medication that was planning this bipolar out and he was seeking an accommodation. Work with me through this. And it never got to that point. Well, what what kind of, you know, usually an accommodation, if someone is potentially abusive, violent, an accommodation might be to put him someplace where he would not give him a different kind of job, where he would not come in contact with people who set him off or customers who come. I could not figure out how that was, how that's really possible in the post office situation. I think I think Your Honors have to have to go along with Judge Wallace's idea that that he's going to keep doing his his job. He's going to keep interacting with customers. Right. He wasn't saying take me away from customers and he wasn't saying take me away from co-workers. He wanted to keep the same job, but he wanted this interactive process to. He wanted that. He wanted them to be as supportive as they could while he kept this job where he potentially could inflict a lot of harm. That's that. It just occurred to me one way to put it is he wanted his his interactive process sought a reasonable accommodation in the form of an interactive process of a different kind, if you will, a person to person interactive process so that when he is becoming hostile in that person's perception, that person can say, look, Mark, I don't appreciate it. Or if that person's intimidated, go to the supervisor and indicate to him if in fact he's if in fact it's not working out, then they can terminate him. But they have an obligation to interact with him towards a reasonable accommodation. And the employer never went that extra step. They heard what he proposed. They never came back with another proposal such as, well, what if we put you over at Crystal Bay instead of incline and you can be in the back over here? What if we send you to Reno? They never had any comeback. It was it was just they heard him say, if you guys let me know, then I think I can handle it. Well, they may have heard him say, live with it, because basically that's what he's asking to do. Live with it. Tell me what I'm misbehaving and maybe I'll modify my behavior. But essentially, they're saying I'm still here. You're still there. It's not all that apparent that something's going to change. Well, I think if you look at what the nurse wrote in her email to the decision makers, which is at ER 59, I think you'll see a different story. He's he's pleading for his job and he's he's what's the word? He's submissive at that point in time. He's not he's not being his usual narcissistic self. He's owning up to that. I have a problem which is completely against the grain of a narcissistic personality disorder. So and Dr. Gross said that once the step to making somebody with that type of disorder improve their condition is recognizing that you've got that problem. And here he is telling Persick, I've realized I've got that problem. Let me know if I'm becoming too narcissistic in the workplace. Let me know if I'm becoming hostile in the workplace. I know how to control that now. They never gave him a chance to show that he did know how to control it. Let me change focus ever so slightly because I'm interested in the substance of discussion, but I'm also interested in where you presented the substance of discussion in your brief because I read your brief. The issue which caused the district court to enter summary judgment against your client isn't something you talk about in your brief. Your brief talks about whether your client's disabled, which is a subject which the district court found in favor of your client for purposes of summary judgment. So so where in your brief do you take up the issue that that's supposed to be before us today? You mean down below or here or here? I mean, there's a reason for the summary judgment. The court announces its reason for the summary judgment. I look at your brief and I never found a discussion of that reason. I mean, I find a discussion of whether or not your client is disabled. But I didn't find it and a discussion as to whether this was a pretext. But I didn't find a discussion as to whether the accommodation was reasonable or could actually accomplish anything, which is what the order explicitly said was the basis for the summary judgment. Well, the question here is de novo review and looking at the district court and the record below. What did the district court do? I think we've nailed that down. Well, I've read the district court's order. I know what it says. I looked at your brief and I didn't say where you took issue with it. Where in your brief did you take issue with the factor that caused the district court to enter summary judgment on this? I'd have to go look through it. I'm just being honest. I don't know. Well, I've got to tell you, I've read it now. I don't know either. If the issue was raised by opposing counsel, I'm pretty sure I would have addressed it. But — Well, did you file a reply brief? No, I didn't. So I read the red brief. I think it was observed there that you didn't take issue with the basis for the summary judgment. There's no gray brief, so you didn't answer it. Well, if I didn't, it's on de novo review. No. If you don't bring up an issue on appeal, I mean, if you don't brief an issue in the case, you're entitled to consider it waived. I don't know that we'll exercise that prerogative, but I've got to say, this is really puzzling, because the district court's order is very explicit. It's willing to accept you made it a prima facie case of disability. I get your brief, and it argues whether or not appellant is disabled. Now, that's a fair issue, because you may get that argument coming back from the other side. But what I'd never found, at least as I read it, was a discussion of the issue that caused the district court to enter summary judgment against you. And when I looked at your brief and compared it with your opposition memo to the district court, it's the same thing. In other words, it seems to me you never wrote a brief to this court, and you never wrote a brief addressed to the order. You simply turned in what you'd turned in before and figured that was good enough. And I've got to tell you, it's not good enough. You really need to address the issues that have been identified by the district court's order, and I don't think you have. Well, maybe that's my shortcoming with respect to de novo review and the understanding of oral argument and the decision to forego a reply brief, which is optional before this Court, with the opportunity to come before you and today point out these – this argument, that the district court's finding of fact, basically – the question here is, is there a genuine issue of material fact as to whether or not the employer engaged in a proper interaction towards a reasonable accommodation? And number two, whether the district court's finding, in light of the evidence, that there was no reasonable accommodation available, correct. It's simply a question of whether or not there's an issue of fact for a reasonable juror to look at and go the other way on that particular issue. And we would submit that there is. Well, you know what the issues are. I'm just suggesting it would have been nice if you'd argued those issues in the brief. I will endeavor with all my diligence to do that in the future, and if that's the case here, I apologize to the Court, to the panel. With respect to the – of course, the district court, because it stopped in the middle of the prima facie case on discrimination, did not reach a pretext, but it did reach it over on the other end with the retaliation claim. The district court found that protected activity wasn't really challenged, that causal connection existed by virtue of temporal proximity, and then went on to analyze the pretext case. And here the district court found that there is no genuine issue of material fact with respect to the legitimate nonretaliatory reason for the discharge. Going back to the discrimination case, had the district court addressed the pretext issue, the district court would have had to consider the additional evidence of discriminatory intent found at ER 65, which is Nurse Persick's notes, which indicate that the decision to remove him was made in a meeting with the decision-makers after they had reviewed Dr. Armitage's report. So that – that takes care of the pretext issue with respect to the discrimination claim. With respect to the retaliation aspect of it, we would go – we don't have any direct evidence of retaliatory intent. We've got the temporal proximity being very proximate between Dr. Armitage's report and the request for accommodation to – to Nurse Persick that the decision maker was aware of, and the decision to terminate. So we have that. But going to the question of whether or not these were actual threats, I think, is the first question of pretext, because the whole thing runs from the – the assumption that these are threats. And are they threats? Did any one of these women say, he threatened me? And I think there's an issue of fact on that, because he denies in his declaration and he denied to Silverberg that – that's the decision-maker, the postmaster. He denied to him, when asked, whether he made these statements. So there's an issue of fact about whether, in fact, he made those statements, an issue of fact not just that he denies he said them, but an issue of fact in the employer's mind because Silverberg admits that he denied them. So there were two sides of the story. And if you go further and look at what exactly they complained about, you see that Bougieau, Sheila Bougieau, did not want him to have any disciplinary action, that she wanted supervisors to be more present in the workplace. She understood that – and so did Silverberg – that DOA – DOA is a male term for late mail. It's not necessarily a term of violence. The other lady who complained about, we're going to – you haven't had a cold in five years, well, it's time for you to have one now and we're going to take you all down with me. She said that's the only time anything like that has ever been said by him. It's a one-time incident with him. And the other lady's statement is a witness to that statement, and she said she wasn't bothered by it. So there's a genuine issue of material fact with respect to whether there were threats in the workplace. We would ask, Your Honors, to reverse and remand for further proceedings consistent with this Court's law. Kennedy. I want to ask you about a retaliation issue. Do I understand correctly the only place that comes up in your brief is in a footnote? No, Your Honor. I don't think so. I think it came up in – down below, I think it came up in a footnote in their brief. That's my recollection. And they only attacked the question of legitimate, you know, pretext, which I just went through. Okay? Okay? Thank you. Good morning. Thank you, Your Honor. My name is Greg Addington. I'm an assistant United States attorney for the District of Nevada in Reno. Do you want to put the microphone in front of you? I will. Thank you. It was my pleasure to represent the Postal Service and postal officials before the District Court as well as before this Court. The disposition by the District Court of Mr. Perkins' discrimination claims under the model for evaluating claims of discrimination under the Rehabilitation Act. There's two separate models, one for straightforward claims of discrimination based on a person's status as a disabled person, a slightly different model for evaluating retaliation or reprisal claims. Both types of claims were made, and the District Court evaluated both of them in turn. The District Court followed a very familiar burden-shifting process that has been endorsed, of course, by this Court many times since McDonnell Douglas was issued, and that same burden-shifting process or evaluative process is, of course, followed by District Courts all over the country in adjudicating Title VII claims, Rehabilitation Act claims, ADA-type claims. And the District Court's order is fairly lengthy, as it needed to be, and it reflects a very thorough analysis following those two analytic models, and it also reflects a very rigorous examination of the evidentiary materials which were presented to the District Court, both in support of and in opposition to summary judgment. Mr. Perkins was terminated. Postal Service uses the term removed from his Postal Service position in mid-2004. His removal was proposed by Mr. Silverberg, the postmaster of the facility. Mr. Silverberg did not have the authority to remove an employee. He simply had the authority to propose it, and he did so. The actual decision-maker was Michelle Camacho, who was the next person in the postal management chain of authority, and she had the authority to either accept the proposal or alter the disciplinary process for some other lesser discipline or to approve the removal. And what was in front of her was not any information about Mr. Perkins' disability. In fact, she testified in her deposition that she had no awareness of, no knowledge of, no information about any claim of disability or any request for accommodation. What she had in front of her was the reports of his behavior. And that was the focus of her attention. She allowed – she permitted a hearing before her with Mr. Perkins and his union representative. At that time, Mr. Perkins did not deny the behavior that had been described to Ms. Camacho. And so what Ms. Camacho had was this documentation of this behavior, no suggestion of any type of disability or request for accommodation. And really, I think the district court could have cut off the prima facie evaluation at that point and said, well, if the – if the decisionmaker doesn't even know that the person is claiming a disability or has a disability and hasn't requested accommodation, then plainly the decisionmaker cannot base a – cannot have a discriminatory animus based on that disability. The district court didn't go down that road. It continued down to prima facie analysis. And I'll get to that in a moment. But what Ms. Camacho had in front of her was this pattern of abusive, threatening, and hostile and very distressing behavior reported by Mr. Perkins's co-employees in this fairly small postal facility in Crystal Bay in Incline Village. It's described in some detail not only in the depositions that were taken of the three reporting co-employees, but also in their contemporaneous letters and memoranda that they had supplied at the time of the behavior, supplied to postal management, describing Mr. Perkins's behavior, not just to them, but to postal customers as well. And it also – those memoranda also described the effect that Mr. Perkins's behavior had on them, his co-employees. Those memoranda and their deposition testimony described Mr. Perkins's behavior towards customers, where he would tell customers that he is insane, that he would tell customers – he would greet customers by asking, which disgruntled employee do you want to wait on you today? And he would tell customers that there's nobody here that's competent to help you, that there's no competent employees around. And his co-employees, as well as the customers, obviously heard those remarks. They were distressed by them. It humiliated them, and they shouldn't be required to put up with that type of environment. Mr. Perkins also interacted directly with his co-employees, and the memoranda and the depositions describe those encounters as well. And, of course, they're reflected in the brief as well. But briefly, Mr. Perkins would make comments and remarks to his co-employees that were very distressing, which they perceived as – the term threatening is a little bit difficult to use, but they were distressed. They were disturbed. They didn't know what to make of these remarks because the language that was being used was – could be construed as threatening. He had previously used terminology with other employees a year earlier about going postal. Right. I think we understand all of that. Can you just – there are only two issues that are raised in the brief. Can you – is there – the argument is – as to the disability, it says the appellant asserts that there's a genuine issue of material fact as to whether or not the appellant is disabled. I don't have any quarrel with the district court's finding that he has a – that affected his interaction with other people, and that's a major one. In other words, there's no real question that he has a problem. I don't necessarily – I concede it for purposes of today. I have no quarrel with the district court's conclusion, and that was not the focus of the district court's disposition of the claim. The focus of the district court's disposition of the claim was what? That he was not a person otherwise qualified to perform the essential functions of his job because he was unable to interact with other people without acting in a hostile and abusive and threatening way. And is there anything in the appellant's brief that you feel that you need to respond to that says – that makes any kind of argument that that's incorrect? My answering brief really didn't respond directly to the arguments raised in the opening brief. Rather, I focused on the order and tried to support the order. That's right. And there's nothing in the opening brief that really zeroes in on anything that's  Is that correct? I didn't perceive it that way. I'm trying to help you. I don't think I can improve on how the district court disposed of the case. And, in fact, I think the district court did a very fine job in evaluating the accommodation that was requested and why it was per se unreasonable. And I would urge this court to affirm on that same basis. I think that the judgment on the Rehabilitation Act claim could be affirmed, disposed of on other grounds as well, but the district court's evaluation is sound. And so my brief was an effort to not so much respond to the opening brief but to support the district court's disposition. Because, again, I think Dr. Ammerding said this behavior is going to continue. Mr. Perkins' own declaration said this behavior is going to continue. I need somebody to tell me when I am abusing somebody and threatening somebody. And then I'll be able to change. Well, a year earlier, he had gone through a similar disciplinary process, and he had told Mr. Silverberg, I know exactly what I'm doing, and I know exactly the effect I have on people, and that's why I do it. Now, maybe that's an element of his disability, perhaps. I'll accept that. But the point is the accommodation that he is requesting is simply an extraordinary burden, not only to place on postal management, but to place on his co-employees. And to the public. And to the public. And a possible threat to the public. Okay. Thank you. I don't think we have any questions. I think we've eliminated a couple of pages of my argument. I don't think you have to. All right. Do we have any questions on this? I have no questions. Unless there's questions about the Privacy Act claim, I'm certainly prepared to address that as well. That obviously follows a completely different rule. I think it's very thoroughly briefed, and I think my colleagues agree. Then I will not run the risk of trying to improve on what has already been accepted as adequate. Thank you very much. Thank you. Judge Wallace, I did in a footnote. Here's what the footnote says. You're correct. The only issue addressed on the retaliation claim on appeal was the question of whether or not there was evidence of pretext as to the termination. And so in footnote number 10, I said that in the footnote the retaliation claim was addressed. And I meant to refer to below. That was my understanding. This is part of the problem with your cut-and-paste brief. Okay. But it says the sole assertion here is the same legitimate nondiscriminatory rationale, therefore the same evidence that I've just discussed with respect to the discrimination claim. That's the only argument in that footnote. But it incorporates that argument as to pretext, which would be the same for the discrimination claim. I understand. The problem we have is that we have to really zero in. If we're going to hold in your favor and be able to identify something that the district court got wrong here, and your brief doesn't really help us do that. And so this is kind of your last chance. Is there two sentences that you can give us that says this is why the district court was wrong, even though my client has a disability and engaged over a long period of time in disruptive and potentially hostile conduct? The we would point the Court to our argument with respect to pretext, because the district court below found a prima facie case of retaliation. And there's no real dispute with that here. The temple proximity is very close. So go to the argument about pretext, which is asserted below, is asserted in the brief here, and is the same argument as for discrimination and retaliation. The pretext being? Pretext being that there were no threats made. A reasonable juror could find. A reasonable juror could find that there were no threats made based upon what I said before up here. Okay. I got you. All right? The DOAs and all that. It was not a threat. Okay. Okay? It was not understood as possibly a threat, either. A reasonable juror could conclude that it was unreasonable for the employer to take that evidence and make a conclusion that it was a threat. And keep in mind that the rationale for the termination was a hostile working environment. That's, if you look at the, if you look at it carefully, that's what it is. It's not zero tolerance policy for threats and for violence in the workplace. It's about a hostile environment being created for coworkers and for customers. Right. Okay. It was dangerous. Thank you. Thank you, Your Honor. The case just argued is submitted for decision. And we'll hear the last case, which is the National Labor Relations Board versus the United Food Commercial Workers Union.
judges: Wallace, Schroeder, Clifton